

U.S. Department of Justice

United States Attorney
Eastern District of New York

EAG
F. #2018R001021

271 Cadman Plaza East
Brooklyn, New York 11201

March 16, 2020

By ECF

The Honorable Carol B. Amon
United States District Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re:   United States v. Bosco, et al.
      Criminal Docket No. 19-443 (CBA)

Dear Judge Amon:

The government respectfully submits this letter in connection with the sentencing proceedings for the defendants Joseph Bosco, Nicholas Bosco and Anthony Bosco, which are currently scheduled for March 23, 2020 at 11:0 a.m. For the reasons set forth below, the government respectfully asks the Court to sentence the defendant to a term of imprisonment within the applicable advisory Guidelines range.

BACKGROUND

Nicholas Bosco, his father Joseph Bosco and Nicholas Bosco's cousin Anthony Bosco were charged with a Travel Act violation involving an extortion related to money owed by John Doe to Nicholas Bosco.

Since in or about 2015, John Doe placed bets on sporting events with Anthony Bosco and, later, Nicholas Bosco. As of November 2018, John Doe approximately $10,000 to Nicholas Bosco and another $3,500 to Anthony Bosco. In or about and between November 2018 and January 2019, Anthony Bosco sent John Doe several text messages including one wherein he threatened to assault John Doe if John Doe's debt to Anthony Bosco was not repaid.

On or about the evening of November 29, 2018, Nicholas and Anthony Bosco drove to John Doe's house in Staten Island, where John Doe resided with his mother and others. John Doe was not home at the time, but Nicholas Bosco did confront John Doe's

mother. Specifically, while Anthony Bosco remained in the car, Nicholas Bosco told John Doe's mother that John Doe would be physically hurt if John Doe did not repay his debt to Nicholas Bosco.

In or about December 2018, Joseph Bosco called and sent text messages to John Doe on numerous occasions. As part of those communications, Joseph Bosco stated, in substance, that John Doe needed to get money and pay his son, Nicholas Bosco, or he would confront John Doe at his house.

While the defendants were not intercepted on wiretap communications discussing the charged crimes, John Doe provided a contemporaneous accounting of the matter to Joseph Amato Jr., and Amato Jr. then employed the assistance of his father, Joseph Amato Sr., who held the position of a captain in the Colombo organized crime family of La Cosa Nostra. As a result, there are several wiretap intercepts documenting the threats lodged by the defendants. For example, on November 30, 2018 at 4:18 p.m. (JA# 3888), Amato Sr. and Amato Jr. had the following conversation:[1]

> AMATO, JR.: I forgot to tell you, um, remember that situation with Nick Bosco?
> AMATO: Yeah
> AMATO, JR.: I went to my friend [John Doe]'s house yesterday, his mother is very nervous and concerned about her son. And uh, she's a good woman, she's like you know, she's cool like us, whatever.
> AMATO: Yeah.
> AMATO, JR.: And she just wants to make sure, like you know, her son's gonna be okay and stuff, you know I promised her he's gonna be alright, whatever you know, don't worry about it, this and that.
> AMATO: Yeah.
> AMATO, JR.: And you know, I told the kid what to say, he said what he had to say.
> AMATO: Yeah.
> AMATO, JR.: And then, you know, they're talking to him today, the kid Nick's [a reference to the defendant Nicholas Bosco] talking all crazy, reckless, this that and then he went to his house last night knocked on the door, and uh, his mother opened the window, said "What do you want," he's like, "Oh," he's like, "Where's your son? I need to speak to your son." She's like, "Oh, you're not speaking to my son," this that, "You were told what it is," and then, the kid's like, "Nah, nah, sorry about that," and she's

---

[1] Intercepted communications are assigned a particular session number. Telephone calls and text messages intercepted over Amato's cellular telephone are identified as "JA #"; and telephone calls and text messages intercepted over Amato Jr.'s cellular telephone are identified as "JAJ #."

2

|  |  |
|---|---|
| | like, "I know exactly what it's about, get out of here." She's like, he's like, "That's fine, cause your son's gonna get hurt." |
| AMATO: | Oh yeah? |
| AMATO, JR.: | And then, and then, today, they're going back and forth with it, and now today, he's like, "Yeah," he's like, "The way I was taught is, you know, things like this happen, people get hurt." |
| AMATO: | Let me call you back, please, because I just might as well just go turn myself in, alright? |

When Amato Jr. said "he went to his house last night knocked on the door," he was referring to Nicholas Bosco having gone to John Doe's house the prior night, November 29, 2019. Moreover, when Amato Jr. said "That's fine, cause your son's gonna get hurt," he was relaying to his father the message that Nicholas Bosco had delivered to John Doe's mother regarding her son the prior night. Additionally, when Amato Jr. said, "Now today, he's like, 'Yeah,' he's like, 'The way I was taught is, you know, things like this happen, people get hurt,'" he was relaying a message that Nicholas Bosco personally gave John Doe that day, which constituted a second physical threat regarding John Doe's outstanding debt to Nicholas Bosco.

On December 7, 2018, Amato Jr. and John Doe had the following conversation (JAJ #959):

|  |  |
|---|---|
| AMATO, JR: | What's going on? |
| JOHN DOE: | Nothing. Yo I just got a phone call from that guy Rocky [a nickname John Doe used for the defendant Joseph Bosco]. |
| AMATO, JR: | Yeah what happened? |
| JOHN DOE: | He's like freaking out on the phone saying like if a you better pay this kid. I'll come to your house ba ba ba. He's like, he's like, "If you want to sit down with somebody, get them today." I didn't know what to say on the phone I was like I got to call somebody. I'll call you back. |
| AMATO, JR: | No, just tell him my friend is Joe A [a reference to Joseph Amato Sr.]. Tell him to reach out to Joey A, tell him that. Call him back right now. Call him back |
| JOHN DOE: | Tell him get in touch with Joey A? |
| AMATO, JR: | My friend is Joey A, get in touch with him. Just have him get in touch with him |
| JOHN DOE: | Alright, just say that? |
| AMATO, JR: | Keep it nice and short and call me right back, because I'm going to meet him right now anyway. |
| JOHN DOE: | You are going to meet your dad? |
| AMATO, JR: | Yeah. So go do this now. |
| JOHN DOE: | Alright so I'll call him and say get in touch with my friend Joey A? Big Joey A? |
| AMATO, JR: | Yeah Joey A Sr. |

3

>JOHN DOE: Alright, alright.
>AMATO, JR: Alright bye.

"Rocky" was a reference to Joseph Bosco, and when "Rocky" told John Doe that he "better pay this kid," he was referring to his son, Nicholas Bosco. Moreover, Joseph Bosco's apparent offer to "sit down with somebody," was a clear invitation to John Doe to seek assistance from members of organized crime who could potentially offer protection to John Doe.

On or about December 7, 2018, Amato Jr. and John Doe had the following conversation (JAJ #1005):

>AMATO JR: Yeah the guy's gonna get in touch with him. Bosco has been calling me like crazy he wants to see me when I get home. He's like panicking.
>JOHN DOE: Who Anthony?
>AMATO JR: Yeah.
>JOHN DOE: No way.
>AMATO JR: Yeah.
>JOHN DOE: Wait, so did the guy get in touch with your dad?
>AMATO JR: He will eventually. He's gonna.
>JOHN DOE: Okay, when I said to him that he's like, "yeah, no problem, I know him. No problem."
>AMATO JR: As far as anything goes, you personally went to go speak to him. Not me doing it for you. You know what I mean?
>JOHN DOE: Yeah they will understand that 'cause they know you and me are close. He knows that obviously.
>AMATO JR: If anyone asks you, yesterday you called him to speak to him.
>JOHN DOE: Alright. Anthony's been calling you to meet up with you?
>AMATO JR (UI) Just remember what's happening to you bro.
>JOHN DOE: I know buddy.
>AMATO JR: I'm looking out with this shit.
>JOHN DOE: Yeah. I know how much you love me.
>AMATO JR: I wouldn't be doing that if you were some fucking stranger bro.

"Anthony" is a reference to Anthony Bosco, and when John Doe referred to a "guy" getting in touch with "your dad," he was referring to Joseph Bosco getting in touch with Amato Sr., who would potentially be able to protect John Doe. Later that same day, John Doe and Amato Jr. had another phone call wherein they discussed the same subject matter (JAJ #1042):

>JOHN DOE: You speak to fucking Anthony?
>AMATO JR: Nah, I didn't call him.
>JOHN DOE: What?
>AMATO JR: I didn't call him 'cause (UI).
>JOHN DOE: Okay, yeah, I don't even know why he's trying to get involved.

4

      AMATO JR:  (UI)
      JOHN DOE:  What's up?
      AMATO JR:  (UI) 'cause he's a fucking fag.  I don't give a fuck less.
      JOHN DOE:  Yeah, I don't know.  He tries to be like a wanna-be mobster.  I don't know what the fuck's wrong with that kid.
      AMATO JR:  (UI) fucking fag.

On December 21, 2018, John Doe had a phone call with Amato Jr. wherein he reported that he had "just got a call from Nicky's dad," i.e., Joseph Bosco, who said that "he sat down with Joe Senior and he said he doesn't want anything to do with it, and he's gotta meet me direct for the full payment." (JAJ 3023).  Thereafter, John Doe and Amato Jr. spoke again (JAJ #3025), and John Doe reported that Joseph Bosco had informed him that "if [he didn't] get [the money] Sunday, [John Doe was] really going to disrespect [him], and [he would] do what [he had to] do."  These messages constitute clear physical threats.

## DISCUSSION

The government respectfully submits that, in this case, a sentence within the advisory Guidelines range is appropriate in light of all relevant factors, including the nature and characteristics of the offense, the history and characteristics of the defendant, and the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment, to afford adequate deterrence and to protect the public.

I.      Legal Standard

The Sentencing Guidelines are advisory, not mandatory.  United States v. Booker, 125 S. Ct. 738, 764-65 (2005).  However, the Supreme Court held in Booker that the sentencing court must consider the Guidelines in formulating an appropriate sentence.  Id.  In Gall v. United States, 552 U.S. 38 (2007), the Supreme Court set forth the procedure for sentencing courts to follow in light of Booker:

> [A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range.  As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark.

Gall, 552 U.S. at 49 (citation omitted).  Next, a district court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party.  In so doing, [the district court] may not presume that the Guidelines range is reasonable.  [The district court] must make an individualized assessment based on the facts presented." Id. at 49-50 (citation and footnote omitted).

II.     Nicholas Bosco Qualifies Within Criminal History Category II

In an objection to Probation, Nicholas Bosco contends that his prior conviction for driving while ability impaired by consumption of alcohol ("DWAI") should not be included in his criminal history calculation. Nicholas Bosco relies on the decision in United States v. Paredes, 2016 WL 2619845 (E.D.N.Y. May 5, 2016). In Paredes, Judge Jack B. Weinstein refused to apply amended Application Note 5 to U.S.S.G. § 4A1.2 and did not count Paredes' New York DWAI sentence when imposing sentence. Paredes held that the application note did not apply because (1) it refers to "convictions," and violations of the New York DWAI statute are "infractions," meaning that Paredes "probably" was advised in state court that he was not admitting to a crime; and (2) a person can commit a DWAI offense even if not driving and thus it is not categorically more serious that offenses listed in U.S.S.G. § 4A1.2(c)(1), including reckless driving. Id. at *7.

Nicholas Bosco's reliance on Paredes is unavailing. First, the "infraction/conviction" distinction does not matter. The Application Note makes clear that it applies "without regard to how the offense is classified." U.S.S.G. § 4A1.2 cmt. n.5. Indeed, Amendment 766 explains that "convictions for driving while intoxicated and similar offenses can be classified as anything from traffic infractions to misdemeanors and felonies and they are subject to a broad spectrum of penalties." It would lead to unwarranted nationwide sentencing disparities, inconsistent with 18 U.S.C. § 3553(a)(6), to condition criminal history scoring on the manner in which each state chooses to name and classify its alcohol-related driving offenses and the advice about future consequences it requires, if any, when an offender pleads guilty or otherwise admits such conduct in state court.

Further, although it may be possible for an offender to commit a DWAI infraction in a less dangerous way, such as when not driving a vehicle, that does not prevent the Sentencing Commission from assigning a criminal history point to all violations without regard to the facts of any particular violation. Indeed, the Guidelines' approach of assigning criminal history points to groups of offenses necessarily presupposes that within each group there may be differences in the underlying conduct. That such an approach estimates severity without absolute precision does not render it invalid. And, in most cases, district courts have discretion to depart under U.S.S.G. § 4A1.3(b) for an over-stated criminal history category or vary downward to account for any perceived unfairness. In short, Nicholas Bosco offers no sound reason why Application Note 5 does not apply here.

III.    A Sentence Within the Guidelines Range Is
        Appropriate In This Case

Based on the factors set forth in 18 U.S.C. § 3553(a), a sentence within the Guidelines range is appropriate in this case. Both the nature and circumstances of the offense and the history and characteristics of the defendants support sentences within the Guidelines range. The defendants have been convicted of an offense involving threats of violence to collect a $10,000 gambling debt owed to the defendant Nicholas Bosco. Using threats of violence to collect a debt is a serious crime. 18 U.S.C. § 3553(a)(1). The

intercepted communications demonstrate that the defendants engaged in a combined effort to intimidate John Doe and John Doe's mother.  For example, after Nicholas Bosco threatened John Doe through his mother at their home on November 29, 2019, his father, Joseph Bosco, reached out to John Doe directly.  When he reached out directly, Joseph Bosco demanded John Doe pay his son and threatened that he too would come to John Doe's house.  Not only did Joseph Bosco threaten John Doe, he invited John Doe to involve someone in organized crime who could attend a "sit down" on John Doe's behalf.  In lights of these facts, the nature and circumstances of the offense support the imposition of a sentence with the Guidelines range.

A sentence within the advisory Guidelines range is necessary to afford adequate deterrence to criminal conduct and to protect the public from further crimes of the defendants.  18 U.S.C. § 3553(a)(2)(B) & (c).  "Under section 3553(a)(2)(B), there are two major considerations: specific and general deterrence."  United States v. Davis, No. 08-CR-332 (JBW), 2010 WL 1221709, at *2 (E.D.N.Y. March 29, 2010).  Both considerations support the imposition of a term within the advisory Guidelines range in this case.

## CONCLUSION

In this case, given all of the facts and circumstances discussed above, a sentence within the applicable Guidelines range is necessary in order to achieve the purposes set forth in 18 U.S.C. § 3553(a).

Respectfully submitted,

RICHARD P. DONOGHUE
United States Attorney

By:   /s/
      Elizabeth Geddes
      Assistant U.S. Attorney
      (718) 254-6430

cc:   Clerk of the Court (CBA) (by ECF)
      Defense Counsel (by ECF)